IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TERESA NEAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-cv-647-RAH |
| | ) | |
| GMRI, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

### **I.     Introduction**

This is a sex discrimination and retaliation case arising out of Plaintiff Teresa Neal's employment at GMRI, Inc., which does business as "Cheddar's Scratch Kitchen" (CSK) in Dothan, Alabama. (Doc. 1, p. 1; Doc. 9-1, p. 2.)  Neal has sued CSK and her former supervisor, Jamal Rowell, under federal and state law concerning the actions of Mr. Rowell.

Pending before the Court is the Defendants' Motion to Compel Arbitration and Stay Proceedings. (Doc. 9.)  Neal has filed a Response (Doc. 14) and the Defendants have filed a Reply (Doc. 17).  The parties also have participated in oral argument.  For the foregoing reasons, the Court will GRANT the Defendants' motion.

### **II.    Background**

1

Neal began working at CSK as a line cook/culinary assistant in November 2017 and reported to Jamal Rowel. (Doc. 1, p. 3; Doc. 9-1, p. 3.) Neal acknowledges that when she began her employment, she electronically executed various documents, including the "Cheddar's Casual Café, Inc. Dispute Resolution Program and Mutual Agreement to Arbitrate Claims" (CCC agreement). (Doc. 9-1.)

Neal claims that, during the course of her employment, Rowell made continuous unwelcomed sexual comments to her. (Doc. 1, pp. 3-4.) Many of these comments were overheard by management at CSK, but nothing was done. (Doc. 1, p. 5.) In February 2018, Neal complained to front-office employee, Vickie Lott, about Mr. Rowell, but again, nothing was done to stop Rowell. (Doc. 1, p. 6.)

In May 2018, CSK posted a memo in the restaurant that notified employees of the new Darden Dispute Resolution Process (Darden DRP) that would become effective on June 8, 2018. (Doc. 9-1, p. 4; Doc. 17-1, p. 3.) CSK employees, including Neal, were told to log into the company computer and electronically acknowledge the new Darden DRP. (Doc. 9-1, p. 4.) Neal, however, did not do so.

On July 25, 2018, Neal's company account was accessed using Neal's personal log-in information. (Doc. 9-1, p. 5.) According to CSK, Neal herself logged into the computer using Neal's own unique personal log-in information and "electronically acknowledged her receipt and reading of the DRP booklet." (Doc. 9-1, p. 5; Doc. 17-2, p. 3.)

Neal disputes this. (Doc. 1, p. 10.)  As explained by Neal in her affidavit testimony, she "went into the office and Vicki [Lott] was at a table with a computer" and "already had something pulled up on the screen." (Doc. 14-2, p. 2.) Neal further testified that Lott "stood over [her] with her hand on the mouse, and quickly clicked through a bunch of screens on the computer" so quickly that Neal could not read what was on the screens. (Doc. 14-2, pp. 2-3.) Neal was "not actually allowed to read what was on the computer screen as [Lott] just clicked through all of the screens." (Doc. 1, p. 10.)  When Neal asked Lott what was showing on the screens, Lott responded by saying that it was something that everyone had to do. (Doc. 14-2, p. 3.) One of the documents purportedly shown on the screen was the Darden DRP. (Doc. 9-1, pp. 31-48.)

Neal filed this lawsuit on September 6, 2019 against CSK and Rowell, after she resigned because of the actions of Rowell. In response, CSK and Rowell moved to compel arbitration based upon arbitration agreements allegedly acknowledged by Neal during her employment at CSK, including the CCC agreement and the Darden DRP.

### III.   Relevant Legal Principles

"Under the FAA, parties cannot be forced to submit to arbitration if they have not agreed to do so." *Chambers v. Groome Transp. of Alabama*, 41 F.Supp.3d 1327,

1339 (M.D. Ala. 2014) (Watkins, J.) (quoting *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992)). A court must determine whether there is an agreement to arbitrate, which is generally a decision for the court and not an arbitrator unless the parties have expressly agreed otherwise. *See Chambers*, 41 F.Supp.3d at 1335-1336 (discussing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995)).

A plaintiff, who challenges the existence of an arbitration agreement, also has the following burden:

> [The Eleventh Circuit has] said that a party seeking to avoid arbitration must unequivocally deny that an agreement to arbitrate was reached and must offer some evidence to substantiate the denial. More specifically, we require a party resisting arbitration to "substantiate[] the denial of the contract with enough evidence to make the denial colorable." Once an agreement to arbitrate is thus put "in issue," the Federal Arbitration Act (FAA) requires the district court to "proceed summarily to the trial thereof" and if the objecting party has not requested a jury trial, "the court shall hear and determine such issue." 9 U.S.C. § 4.

*Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. App'x 782, 785 (11th Cir. 2008) (internal citations omitted).

The test to determine arbitrability and the allocation of the parties' burdens is clear:
> Section 2 [of the FAA] requires a two-pronged inquiry: first, whether there is an arbitration agreement in writing; and second, if so, whether the agreement is part of a transaction involving interstate commerce. [The party seeking to compel arbitration] bears the burden of proving both prongs.  These prongs also are not resolved with the "thumb on the scale in favor of arbitration because the federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.

*Chambers*, 41 F.Supp.3d at 1338 (internal citations omitted). Moreover, courts must usually look to state law principles of contract formation to determine whether an agreement to arbitrate exists. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 131 L. Ed. 2d 985 (1995); *Chambers*, 41 F.Supp.3d at 1342.

The Eleventh Circuit has countenanced the use of the summary judgment standard to resolve a motion to compel arbitration. *See In re Checking Account Overdraft Litig.,* 754 F.3d 1290, 1294 (11th Cir. 2014)(describing an order compelling arbitration as "summary-judgment-like"; it is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate") (quoting *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. App'x. 782, 785-86 (11th Cir. 2008)(*per curiam*)).

**IV. Discussion**

In their motion, the Defendants argue that Neal is required to arbitrate her claims against them based upon two arbitration agreements (the CCC agreement and the Darden DRP) applicable to Neal's employment with CSK. The CCC agreement was electronically acknowledged by Neal upon her employment with CSK, and Neal does not dispute that she is bound by that agreement. The Darden DRP also was electronically provided to Neal, but she disputes that she ever saw, read or acknowledged that agreement. The Court will begin its analysis of the Defendants'

5

motion by first considering the Darden DRP since, according to the Defendants, that agreement was intended to replace and supersede the CCC agreement.

As to the Darden DRP, the parties dispute whether that agreement was electronically acknowledged by Neal. Undoubtedly, a party can be bound by an electronically acknowledged arbitration agreement. *See, e.g., Brueggemann v. NCOA Select, Inc.*, No. 08–80606–CIV, 2009 WL 1873651, at *2 (S.D. Fla. June 30, 2009) (enforcing an online arbitration agreement contained within the terms and conditions of Overstock.com's website, despite Plaintiff's contention that he never saw or agreed to the terms and conditions, where "prior to entering the website, individuals [were] told, '[e]ntering this Site will constitute your acceptance of these terms and conditions. If you do not agree to abide by these terms, please do not enter the Site.'"); *Melver v. Check 'n Go of Florida, Inc*., No. 13-20528-CIV, 2013 WL 12148376 (S.D. Fla. July 22, 2013).

Since a party can be bound by an electronic acknowledgement, the question becomes whether Neal did so, because it is axiomatic that "parties cannot be forced to submit to arbitration if they have not agreed to do so." *Chastain*, 957 F.2d at 854. Under current Eleventh Circuit precedent, in order for the Court to enforce the arbitration agreement, the Court must apply the "summary judgment-like standard," and "may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if there is no genuine dispute as to any material fact

concerning the formation of such an agreement." *Bazemore v. Jefferson Capital Sys., LLC,* 827 F.3d 1325, 1333 (11th Cir. 2016).

Here, the Defendants have not met their summary-judgment-like burden as it concerns the Darden DRP. "Giving Plaintiff the benefit of all reasonable doubts and inferences, material fact issues surrounding contract formation preclude the Court from deciding as a matter of law that the parties did or did not enter into the agreement to arbitrate." *Regan v. Stored Value Cards, Inc*., 85 F.Supp.3d 1357, 1364 (N.D. Ga. 2015) (internal citation omitted).

If the Darden DRP was the only arbitration agreement presented to the Court for enforcement, the Court's inquiry would end there and the parties' next step would be to participate in a trial on the issue of Neal's assent to the Darden DRP. However, the Court's inquiry does not end there because the Defendants also seek enforcement of the CCC agreement.

But before considering the Defendants' ability to enforce the CCC agreement, the Court first must determine whether it is permitted to do so because, as counsel for the Defendants stated at oral argument, the Darden DRP was intended to replace and supersede the CCC agreement.  If it does supersede the CCC agreement, then the Court must resolve the issue of the Darden DRP's enforceability first because the CCC agreement otherwise would be unenforceable.

Resolution of the issue lies largely within the language of the Darden DRP

and whether the Darden DRP contains language suggesting that the Darden DRP was intended to be a novation or substituted contract for the CCC agreement. *See generally Safeco Insurance Co. v. Graybar Electric Co.*, 59 So. 3d 649, 656 (Ala. 2010)(identifying the elements of a novation or substituted contract); *Dasher v. RBC Bank*, 745 F.3d 1111 (11th Cir. 2014)(analyzing whether an arbitration agreement had been superseded and replaced in total when the parties subsequently executed a new account agreement); *Pittman v. Santander Consumer USA*, No. 2:14-CV-87, 2014 WL 1652376 (M.D. Ala. April 24, 2014)(explaining Alabama law and concluding that a subsequent contract did not supersede a prior contract that contained an arbitration clause).

Here, the Court has reviewed the Darden DRP and cannot locate any language stating the Darden DRP was intended to supersede the CCC agreement or that the Darden DRP constituted a novation of the CCC agreement. As such, the Court concludes that it can consider the CCC agreement without first having to determine whether the Darden DRP is enforceable[1] and, in particular, without first having to conduct a trial on the making of the Darden DRP.

Unlike the Darden DRP, as to the CCC agreement, the parties do not dispute

---

[1] That the Darden DRP may have been posted within the restaurant for all to see, a point which Neal does not dispute, does not mean the Darden DRP is binding on Neal. *See*, *e.g.*, *Payne v. WBY, Inc.*, 141 F. Supp. 3d 1344, 1350 (N.D. Ga. 2015); *Valente v. International Follies, Inc.*, No. 1:15-CV-02477, 2016 WL 3128528, at *3 (N.D. Ga. January 6, 2016).

its validity. They do, however, dispute its application to the parties in this case. The Defendants argue the scope of the CCC agreement encompasses Neal's claims against them. Neal disputes this, and points to the language of the CCC agreement which limits its application to "Cheddars Casual Café, Inc." only:

> In recognition of the fact that, from time to time, differences may arise between Cheddar's Casual Café, Inc. (referred to below as the "Company" or "Cheddar's") and its employees during, or after, each employee's employment, the Company has instituted a Dispute Resolution Program and Mutual Agreement to Arbitrate Claims ("Agreement")….
>
> **1. Mutual Agreement to Resolve Disputes Through Arbitration**
>
> This Agreement is mutual, covering all claims that each Employee may have against the Company or that the Company may have against an Employee. All references to "Employee" include each employee or successor, estate, or any other person or entity claiming by or through the Employee.
>
> **2. Claims Covered by this Agreement**
>
> The Company and the Employee consent to the resolution by arbitration of all claims or controversies involving Employee's application with, employment with, or termination from, the Company.
>
> The Claims covered by this Agreement include, but are not limited to, claims for . . . personal injury and employment related tort claims. . . claims for discrimination, retaliation, or harassment of any kind, including without limitation harassment or discrimination based on gender. . . .

(Doc. 9-1, p. 20.)

Neal argues this language does not encompass her claims in this case because her employer was GMRI, Inc., not Cheddar's Casual Café, Inc., and because she is

not suing Cheddar's Casual Café, Inc. More importantly, Neal notes the CCC agreement does not include broad language expanding its application to successors, affiliates, predecessors, agents, representatives, or employees.

For its part, GMRI, Inc. argues that, while the CCC agreement does not contain expansive language, GMRI, Inc. nevertheless comes within the CCC agreement's scope because GMRI, Inc. was Neal's employer, GMRI, Inc. is a wholly owned subsidiary of CCC, and the CCC agreement was intended to include employment claims against Neal's employer and any affiliated persons and entities. Rowell makes a similar argument and contends that he, too, is afforded the benefits of the CCC agreement. Undoubtedly, if the CCC agreement applies to Neal's employment claims against GMRI, Inc. and Rowell, then Neal must arbitrate her claims.

In reading the CCC agreement, the Court notes the agreement contains a delegation clause that provides, in pertinent part, that the "arbitrator has the exclusive authority to resolve any dispute relating to the applicability or enforceability of the Agreement." (Doc. 9-1, p. 23.) *See Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017)(upholding "delegation provision" in an arbitration agreement in which the parties had "agree[d] to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement"). Once there is a delegation clause, "a

court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc*., __ U.S.__, 139 S.Ct. 524, 529, 202 L.Ed. 2d 480 (2019).

The dispute between Neal and the Defendants concerning the application and scope of the CCC agreement to the Defendants is a dispute of arbitrability that must be submitted to the arbitrator for resolution. *See, e.g.*, *Riversa v. L-3 Communications Corp*., No. 8:09-cv-02447, 2010 WL 11629016, at *2 (M.D. Fla. May 24, 2010)(concluding that whether nonsignatory affiliates "are ultimately entitled to enforce the arbitration clause is a matter of the agreement's continued existence, validity, and scope which must be decided by the arbitrator"); *Contec Corporation v. Remote Solution Co., Ltd*., 398 F.3d 205 (2d Cir. 2005)(concluding that signatory to an arbitration agreement must arbitrate dispute against nonsignatory because issue of arbitrability itself is subject to a decision by the arbitrator); *Brittaniana-U Nigeria Ltd. v. Chevron USA, Inc.*, 866 F.3d 709, 715 (5th Cir. 2017); *DeAngelis v. Icon Entertainment Group*, 364 F.Supp.3d 787, 797 (S.D. Ohio 2019)("Whether a nonsignatory can enforce the arbitration agreement is a question of the enforceability of the arbitration clause, as to that defendant."). *See also Wiggins v. Warren Averett LLC*, [Ms. 1170943, Feb. 7, 2020] __ So. 3d __, 2020 WL 597293 (Ala. 2020) (concluding that dispute as to scope and application of

arbitration agreement was for the arbitrator to resolve).

### V.    Conclusion

Accordingly, the Court concludes the CCC agreement contains a valid delegation clause that requires the arbitrator resolve all disputed issues as to arbitrability, including the applicability and enforceability of the CCC agreement to the Defendants. Based on the foregoing, it is **ORDERED and ADJUDGED** that the Defendants' Motion to Compel Arbitration and Stay Proceedings is **GRANTED**.

It is further **ORDERED and ADJUDGED** that this case shall be **STAYED** and closed for administrative purposes. Within fourteen (14) days after the arbitration proceedings are concluded, the parties must file a status report with the Court. Also, the parties must file a status report 180 days from the date of this order.

DONE, this 11th day of February, 2020.

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE
